Anita B. Kartalopoulos, Esq.
Rolando G. Marquez, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, New York  10119
(212) 594-5300

Albert G. Kroll, Esq.
John P.J. Mattiace, Esq.
**KROLL HEINEMAN CARTON LLC**
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey  08830
(732) 491-2100

*Attorneys for Plaintiff-Relator*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

———————————————————x

UNITED STATES OF AMERICA *ex rel.*
[UNDER SEAL],

                   Plaintiffs,

    v.

[UNDER SEAL],

                   Defendant.

———————————————————x

Civil Action No. _____

**COMPLAINT**

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2)**

Anita B. Kartalopoulos, Esq.
Rolando G. Marquez, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, New York  10119
(212) 594-5300

Albert G. Kroll, Esq.
John P.J. Mattiace, Esq.
**KROLL HEINEMAN CARTON LLC**
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey  08830
(732) 491-2100

*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

——————————————————————x

UNITED STATES OF AMERICA *ex rel.*
PATRICIA MIRANDO,

                     Plaintiffs,

    v.

DALLAS CONTRACTING, CO. INC.,

                   Defendant.

——————————————————————x

Civil Action No. _____

**COMPLAINT**

**FILED UNDER SEAL PURSUANT
TO 31 U.S.C. § 3730(b)(2)**

Plaintiff and Relator Patricia Mirando ( "Relator" or "Mirando"), on behalf of the United States of America (the "Government") and pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), files this *qui tam* Complaint against Defendant DALLAS CONTRACTING, CO. INC. ("Dallas" or "Defendant"). In support thereof Relator alleges as follows:

## I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States pursuant to the *qui tam* provisions of the FCA, arising from false claims that Defendant caused to be submitted through Chevron U.S.A., Inc. a/k/a Chevron Energy Solutions ("Chevron") for payment from federal funding in connection with demolition work performed on Building 506, also known as the "Boiler House," located on the grounds of Picatinny Arsenal ("Picatinny"), which started in or about February and March 2009 (the "Boiler House project").

2.    Relator seeks to recover funds defrauded from the Government resulting from the Defendant's policy, practice, and conduct of submitting false claims for reimbursement of the wages paid to its employees, some of whom were illegal undocumented workers, who performed work in-connection with the federally-funded Boiler House construction project. In addition to reaping unlawfully procured payments from the federal treasury, Defendant's unlawful practices have reduced the ability of law-abiding immigrants and American citizens to obtain gainful employment on publicly-funded construction projects, and has depressed the wages of law abiding individuals who Defendant hired to work on construction projects, including those funded by the Government.

3.    The Defendant's FCA violations arise from its submissions of claims for wage reimbursement which falsely certified compliance with the Davis-Bacon and Related Acts

("Davis-Bacon Act"), 40 U.S.C. §§ 3141-3148, which mandates that contractors and subcontractors on federal construction projects pay their employees the prevailing wage rate for their job classification as determined by the Secretary of Labor. *See* 40 U.S.C. § 3142(b).

4.      The Davis-Bacon Act requires that every contract entered into for a covered project "shall contain a stipulation that the contractor or his sub-contractor shall pay all mechanics and laborers employed directly upon the site of the work, unconditionally, and not less than once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specification..." 40 U.S.C. § 3142(c)(1).   Not only must the contractors make payment once a week, but by regulation pursuant to 40 U.S.C. § 3145, contractors must certify that they complied with the Davis-Bacon payment provisions on a weekly basis, when payment is requested from the federal government.  40 U.S.C. § 3145(a); 29 C.F.R. §§ 5.9 - 5.12.

5.      The Defendant's FCA violations further arise from its submissions of claims for wage reimbursement which misrepresent the legal status of its workers on government-funded construction projects.  To conceal the fact that certain of its employees are undocumented, and therefore not qualified to work on these projects, in submitting certified payrolls for wage reimbursement, Defendant lists these employees on the payrolls using phony government identifications, which Defendant knew the employees had obtained.

6.      Dallas perpetrated its unlawful scheme through the misclassification of work performed on the Boiler House job by its employees under the Davis-Bacon wage rate table, the hiring of illegal undocumented workers to perform labor on the Boiler House project, and through a fraudulent arrangement with Dependable Iron & Metal Co., Inc. ("Dependable Iron") whereby the money Dependable Iron paid to Dallas for the scrap metal collected from its various

demolition jobs was transferred in a way that allowed Dallas to avoid the payment of Federal Income taxes. The result of these actions enabled Dallas to underbid its subcontract with Chevron and subsequently to obtain money that would not have otherwise been paid by the Government but for Dallas's unlawful conduct. Upon Chevron's request for payroll records, Dallas submitted to Chevron its own records showing that its workers on the Picatinny job were paid certain wage rates. These rates of payment were not the proper rates of payment under the Davis-Bacon Act. By failing to pay employees at the proper rates required under the Davis-Bacon Act, Dallas profited through lower subcontract bids and lower payments to its employees.

7.    The FCA specifically prohibits Defendant's conduct involving misrepresentations on certified payroll claims related to employment status, employee classification, and wage rates paid, which result in the submission of payrolls that are false on their face and/or contain false certifications of compliance with the rules and regulations promulgated under the Davis-Bacon Act.

8.    Dallas pursued its scheme with the knowledge that (1) the certified payroll records submitted to Chevron misrepresented the proper Davis-Bacon rates and the legal status of its workers, who were identified on the payrolls using phony government identifications; (2) such submissions were unlawful; (3) the failure to actually submit payment of the proper Davis-Bacon rate was unlawful; and (4) employment of undocumented workers on the Picatinny Arsenal Boiler House project was unlawful.

9.    As set forth below, Defendant has engaged in a pattern and practice of submitting false payrolls over the years on other publicly-funded job sites which has been repeated, for example, on the Picatinny Boiler House project. Defendant has knowingly submitted or caused to be submitted for payment numerous false claims in connection with work performed on the

Boiler House project, including false claims for payments to illegal undocumented workers at wages below the prevailing rates on the projects described herein.  Each and every such false claim gives rise to FCA liability, each and every one of which is subject to the civil penalties as provided under the FCA.

## II.   PARTIES

10.     Plaintiff and Relator Patricia Mirando is a resident of the State of New Jersey and was the Office Manager of Defendant Dallas from September 26, 2006 to July 1, 2011.  Ms. Mirando's job duties included maintaining the company financial records and bookkeeping tasks, through which she gained direct and independent knowledge of the fraudulent conduct detailed below.

11.     Defendant Dallas Contracting Co., Inc. is a privately-owned company with its principal place of business currently located at 1260 New Market Ave., South Plainfield, New Jersey, 07080.  The company is owned and operated by two brothers, John Sisto and Don Sisto. Dallas is engaged in the business of demolition and crushing and is a subcontractor on publicly-funded construction projects, including the Boiler House at Picatinny Arsenal.

## III.   JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (conferring federal subject matter jurisdiction) and 31 U.S.C. § 3732 (conferring jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3730 and 3732).

13.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant can be found and/or transacts business in this judicial District. Additionally, this Court has personal jurisdiction over the Defendant because acts prohibited by 31 U.S.C. § 3729 have occurred in this District.  31 U.S.C. § 3732(a).

14.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant can be found, reside, or transact, or have transacted business in this judicial District and/or at least one act proscribed by 31 U.S.C. § 3729 occurred in this District.

15.     Pursuant to 31 U.S.C. § 3730(b)(2), with this Complaint, Relator prepared and has served on the Attorney General of the United States and the United States Attorney for the District of New Jersey a written disclosure of all material evidence and information currently in her possession.

16.     The allegations or transactions herein have not been publicly disclosed in a Federal criminal, civil, or administrative hearing, lawsuit or investigation in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4).

17.     To the extent that there has been a public disclosure unknown to Relator, she is an original source under 31 U.S.C. § 3730(e)(4).

## IV.     LEGAL BACKGROUND

### A.     The False Claims Act

18.     The False Claims Act, 31 U.S.C. § 3729, as amended, provides:

(a)     **Liability for certain acts –**

(1) IN GENERAL- Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

- 5 -

\* \* \*

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(l)-(2) (2006), amended by, 31 U.S.C. § 3729(a)(1)(A)-(B) (West 2010).

19.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

20.     "Knowingly" is defined by the FCA as "mean[ing] that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information...." 31 U.S.C. § 3729(b)(1).

21.     Given its remedial purposes, the FCA is interpreted broadly, and is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

22.     The FCA empowers a private person having information regarding a false or fraudulent claim against the Government to bring an action on the Government's behalf and to share in any recovery.   31 U.S.C. § 3730.   The complaint must be filed under seal without service on the defendant.   *Id.*   The complaint remains under seal to give the Government an opportunity to conduct an investigation into the allegations and to determine whether to join the action. *Id.*

23.     Pursuant to the FCA, Relator seeks to recover, on behalf of the United States, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements or records that the Defendant caused to be submitted for payments that Defendant knew or should have known were going to come from federal funds intended for the Picatinny Arsenal project.

**B.      The Davis-Bacon and Related Acts**

24.     The Davis-Bacon Act, 40 U.S.C. §§ 3141-3148, is a protective labor law that, among other things, requires certain federal government contracts "for construction, alteration, and/or repair of public buildings or public works of the United States" to contain a provision "stating the minimum wages to be paid various classes of laborers and mechanics." 40 U.S.C. § 276a.    Pursuant to corresponding regulations issued by the Department of Labor, the contracting government agency, prior to entering into a given contract, makes an initial determination regarding whether the contract is subject to the Davis-Bacon Act.

25.     If the contract is determined to be subject to the Davis-Bacon provisions, then the agency, through its contracting officer, must determine the appropriate minimum wage for each of the various classes of mechanics and laborers predicted to be needed for the contract. 29 C.F.R. § 5.5.   Those minimum wages must be based upon wage rates determined by the Secretary of Labor, 40 U.S.C. § 276a.   The contracting agency's determination of minimum wages is then included in the request for contract bids.   After opportunity for administrative review of the contracting agency's minimum wage and classification determinations, this data is ultimately incorporated into the contract.

26.     In addition to the Davis-Bacon Act's requirement that a contractor pay the specified wages, Department of Labor regulations require the contractor to maintain payroll

- 7 -

records containing "the name, address, and social security number of each [] worker, his or her correct classification, hourly rates of wages paid . . ., daily and weekly number of hours worked, deductions made and actual wages paid." 29 C.F.R. § 5.5(a)(3)(i).

27.     The contractor must also submit copies of these payroll records on a weekly basis to the contracting agency, 29 C.F.R. § 5.5(a)(3)(ii)(A), along with a statement certifying that the payroll information is correct and complete and that the workers have been paid "not less than the applicable wage rates . . . for the classification of work performed." 29 C.F.R. § 5.5(a)(3)(ii)(B).     The applicable regulations further provide that falsification of the certifications may subject the contractor to liability under the False Claims Act. 29 C.F.R. § 5.5(a)(3)(ii)(D).

28.     In order to qualify for federally-funded construction projects subject to the Davis-Bacon Act, contractors must "certify" that "each laborer or mechanic has been paid not less than the applicable wage rates." 29 CFR § 5.5(a)(3)(B)(3).  Therefore, if a contractor submits a false certification pursuant to this requirement the contractor may be liable under the FCA. 29 C.F.R. § 5.5(a)(3)(ii)(D) ("the falsification of any [such] certification[] may subject the contractor to civil ... prosecution under ... section 231 of title 31 of the United States Code [The False Claims Act, now 31 U.S.C. § 3729].")

## V.     DEFENDANT'S FRAUDULENT SCHEMES

### A.     Picatinny Arsenal Boiler House Demolition

29.     In or about the Fall of 2008, Dallas entered into a contract with Chevron to demolish a Building 506, known as the "Boiler House," at Picatinny Arsenal, located in Morris County, New Jersey.

30.     Dallas successfully bid the project by negotiating a contract provision whereby Dallas would demolish the Boiler House and pay Chevron approximately $140,000 in exchange for the money it anticipated would be earned on the scrap steel, cooper and other metals that Dallas would haul away from the demolition job.  In accepting Dallas's bid, Chevron was able to subcontract the demolition job to Dallas for little to no cost to Chevron.

31.     Dallas was able to make such an attractive bid for the job because, at the time when Dallas submitted its bid, in or about June 2008, scrap prices were priced at a very high level and Dallas expected that it could sell enough of the scrap and make a profit after paying Chevron the money it owed under the contract.

32.     Shortly after making the successful bid for the Boiler House project, however, scrap prices collapsed.

33.     Dallas delayed beginning work on the Boiler House until the Spring of 2009 in hopes that scrap prices would rebound and Dallas could make a profit on the Boiler House project.

34.     Scrap prices had not rebounded when Dallas began work in or about March 2009.

35.     Relator estimates that Dallas reported that it took a loss on the Boiler House project in the amount of approximately $600,000 to $700,000.

36.     Throughout Relator's employment with Dallas, and before the Boiler House project, Dallas received steady payments once each year ("steady yearly payments") of approximately $20,000.00 from a company known as Dependable Iron & Metal Co., Inc. ("Dependable Iron").  According to its internal documentation, Dependable Iron's principal place of business is located at the corner of Rodgers Street and Leesville Avenue in Rahway New Jersey.  Dependable Iron's mailing address is P.O. Box 1012, Rahway, New Jersey.

37.     Dependable Iron made the steady yearly payments to Dallas in exchange for the tons of scrap that Dallas would deliver there.  In addition to these steady yearly payments to Dallas, Dependable Iron would also provide steady payments of cash several times throughout each year to John and Don Sisto that were used for overtime payments to employees, public job shortfall, and personal expenses.

38.     During and after the Boiler House project, Relator found that it was increasingly difficult for Dallas to have sufficient funds to make its payroll every week.

39.     Relator advised John Sisto that Dallas would not be able to not make payroll every week.

40.     John Sisto instructed Relator to go to Dependable Iron for the money that Dallas needed to make payroll every week.

41.     With these instructions from John Sisto in hand, Relator would request the money from Dependable Iron needed to make the weekly payroll, which resulted in Dependable Iron sending weekly checks in the amounts which ranged between approximately $10,000.00 and $15,000.00.  Thus, instead of the yearly payment of approximately $20,000.00 that Dependable Iron ordinarily sent to Dallas, the money requests were being submitted more often so that Dallas could make payroll.

42.     During the time Dallas could not make payroll, additional cash payments from Dependable Iron continued to be paid, along with the checks described in paragraph 41.  Don Sisto would instruct Relator to issue checks payable to "Dallas Contracting Petty Cash," allocate the cash in the accounting books to "garbage" or "refuse services" and make reference in the check's memo line to a garbage ticket number from an actual delivery and payment for garbage.

The purpose of this was to report the payment for garbage services twice when it was actually only paid once and make it easy to report a loss on its books and income tax returns.

43.     Dallas's fraudulent garbage reporting scheme described in paragraph 42 was concealed by the logging of garbage payment tickets which John Sisto would reference.  To do this, John Sisto would find a payment amount on the garbage payment ticket log that was as close as possible to amount of cash payment noted on the petty cash check he instructed Relator to issue.

44.     During the Boiler House project, Chevron required Dallas to submit certified payroll records for the demolition work performed.  For each and every payroll record submitted to Chevron, Dallas certified that the records were truthful and accurate and that the wages paid to each worker complied with the Davis-Bacon Act and federal law.

45.     Although Relator generally handled the payroll records and checks, she refused to sign the certification statement submitted to Chevron with the payroll records knowing that Dallas had not paid their workers at the proper Davis-Bacon rates.

46.     Davis-Bacon Wage Determinations which were in effect at or about the time Dallas was working on the Boiler House project, reveal that for the "Building Construction" classification of work in Morris County, New Jersey, Power Equipment Operators ("Equipment Operators") within Group 1, which includes for example, backhoe and excavator operators, were to be paid at $41.27 per hour (as of July 1, 2008); Laborers were to be paid at $26.75 per hour (as of November 1, 2008); and, Truck Drivers were to be paid at $31.00 per hour (as of May 1, 2008).

47.     There were a total of eight (8) workers on the Boiler House project who performed various jobs duties for which there existed a specific wage rate that Dallas was

required to pay under the Davis-Bacon Act.  None of the workers received the Davis-Bacon rate of pay for the work they performed.

48.    For example, Dallas employee Carl Franzetti, Sr. was an Equipment Operator and Foreman on the Boiler House project, whose duties included operating heavy machinery in the demolition of structures, including a machine known as a "Komatsu 450."  The Komatsu 450 appropriately falls into the category of a backhoe and/or an excavator.  Accordingly, Carl Franzetti Sr. qualified for higher wages based on his job responsibilities.  For his 755 hours of work on this project, however, Dallas paid Carl Franzetti Sr.'s approximately $25.87 per hour, well below the Davis-Bacon rate for the work he performed.

49.    Dallas employee Adam Paszcyk was an Equipment Operator and a second Foreman on the Boiler House project, whose duties also included operating heavy machinery in the demolition of structures, including a Komatsu 450.  Despite his job responsibilities on this job, which qualified him for higher wages, Dallas improperly classified Mr. Paszcyk as engaging in laborers work in order to pay him at a lower wage rate.  For his 103 hours of work on this project, Dallas paid Mr. Paszcyk at a wage rate of approximately $25.66 per hour, well below the Davis-Bacon rate for the work he performed.

50.    Dallas employee Carl Franzetti, Jr. was a Laborer and Equipment Operator on the Boiler House project, whose duties also included operating various types of machinery.  Despite his job responsibilities on this project, which qualified him for higher wages, for his 705 hours of work on this project, Dallas paid Carl Franzetti, Jr. at a wage rate of approximately $17.64 per hour, well below the Davis-Bacon rate for the work he performed.

51.    Dallas employee Joseph Dennick was a truck driver on the Boiler House project, whose duties also included the hauling away of materials from the site.  Despite his job

responsibilities on this project, which qualified him for higher wages, for his 300 hours of work on this project, Dallas paid Carl Franzetti, Jr. at a wage rate of approximately $19.67 per hour, well below the Davis-Bacon rate for the work he performed.

52.     Dallas employee Steven Springer was a truck driver on the Boiler House project, whose duties also included the hauling away of materials form the site and the hauling of all equipment, including all heavy machinery on hauling equipment known as "low beds." Despite his job responsibilities on this project, which qualified him for higher wages, for his 443 hours of work on this project, Dallas paid Mr. Springer at a wage rate of approximately $19.47 per hour, well below the Davis-Bacon rate for the work he performed.

53.     Dallas employee Tadeusz Skarzynski was a Laborer and Equipment Operator on the Boiler House project, whose duties also included the operation of machines known as "skid steers", operation of magnet machines, hand demolition, hand collecting, and the loading of dumpsters with all material from the site.  Despite his job responsibilities on this project, which qualified him for higher wages, for his 100 hours of work on this project, Dallas paid Mr. Skarzynski at a wage rate of approximately $23.87 per hour, well below the Davis-Bacon rate for the work he performed.

54.     Dallas employee Waldemar Frankiewicz was a Laborer and Equipment Operator on the Boiler House project, whose duties also included the operation of machines known as "skid steers", operation of magnet machines, hand demolition, hand collecting, and the loading of dumpsters with all material from the site.  Despite his job responsibilities on this project, which qualified him for higher wages, for his 656 hours of work on this project, Dallas paid Mr. Frankiewicz at a wage rate of approximately $14.08 per hour, well below the Davis-Bacon rate for the work he performed.

55.     Dallas employee Wladyslaw Choinksi was a Laborer and Equipment Operator on the Boiler House project, whose duties also included the operation of machines known as "skid steers", operation of magnet machines, hand demolition, hand collecting, and the loading of dumpsters with all material from the site. Despite his job responsibilities on this project, which qualified him for higher wages, for his 412 hours of work on this project, Dallas paid Mr. Choinksi at a wage rate of approximately $17.83 per hour, well below the Davis-Bacon rate for the work he performed.

56.     In order to set the correct rates to pay each workers, Relator would submit to John Sisto a list of the rates that were closest to what the workers actually performed. When Relator would submit such rates to John Sisto, he would reply (paraphrasing) "that is not how we do it here." John Sisto would then search through the Davis-Bacon wage table to find a job description that was paid at a lower rate than the job the workers actually performed on the site in order to falsify the wages for each worker on the Boiler House project, John Sisto typically would classify the workers as carrying out "seeding and grading," or various "cleaning services" on the Boiler House project knowing full well that those classifications were false.

57.     Although Relator generally handled the payroll duties, because she knew that Dallas had intentionally misclassified its workers and had not paid their workers at the proper Davis-Bacon rates, she refused to sign the certification payroll records submitted to Chevron.

58.     Dallas knowingly falsified payroll records for this project in the manner exemplified in the preceding paragraphs on a regular basis with the intent to get payment from Chevron, which in turn was being paid by the Government under its prime contract.

59.     Each of the falsely certified payrolls submitted by Dallas for the Boiler House project is a violation of the Davis-Bacon Act; thus, each submission of those certified payrolls constitutes a false claim for payment which gives rise to liability under the FCA.

60.     In addition, Dallas has engaged in the practice of hiring illegal undocumented workers from Poland, employing them for nearly all of its jobs, including the Boiler House project.

61.     Relator inquired to John Sisto and Don Sisto whether United States Department of Homeland Security Form I-9 Employment Eligibility Verification Forms ("I-9 Forms") should be presented to Dallas employees, to which the Sistos responded emphatically that I-9 Forms should never be presented to their employees.

62.     Rather, the undocumented workers employed by Dallas obtain bogus documentation from entities located in Paterson, New Jersey that engage in illegal counterfeiting of government documents.

63.     Dallas employs multiple illegal undocumented workers at any one time, including individuals named Tadeusz Skarzynski, Waldemar Frankewicz, Waldemar Choinski, and Tadeusz Wroblewski.  Some or all of these workers obtain false documentation through illegal means.

64.     For those who do not have false documentation, when reporting illegal undocumented workers from Poland, Dallas uses the Social Security Number of Eugeniusz Lapinski, a former employee who used to work for the company many years ago.

65.     Although Mr. Lapinski no longer works for Dallas, Dallas's payroll records reflect the Social Security Number "xxx-xx-4269" associated with the name Eugeniusz Lapinski as still being employed by the company.  In other words, Dallas's payroll records demonstrate

that Lapinski was re-hired over and over again throughout the years even though he no longer works there.

66.    Of the eight (8) workers on the Boiler House project, at least two (2) were undocumented illegal workers, who were listed on the certified payrolls with either an identifier from false documentation obtained through illegal means or with the Lapinski Social Security Number "xxx-xx-4269."

67.    In employing these workers on the Boiler House project, Dallas knew of the workers' undocumented status, and yet when submitting the payroll records to Chevron, Dallas knowingly utilized bogus Social Security Numbers or other phony government identification for these undocumented workers.  All certified payrolls which listed the undocumented workers with bogus Social Security Numbers were false on their face, providing an independent basis of liability under the FCA.

**B.    Prior Prevailing Wage Violations at Passaic County College**

68.    Although Dallas's failure to pay prevailing wages to its employees on the Boiler House project may have seemingly gone unnoticed, this same conduct was the subject of investigation by state labor officials on another of Dallas's jobs at Passaic County College in New Jersey.

69.    In or about 2010, Dallas subcontracted with ICS Builders ("ICS") to perform work on Passaic County College ("PCC").

70.    The PCC job was funded by the State of New Jersey; therefore, the job was governed by the New Jersey Prevailing Wage Act ("NJPWA").  N.J.S.A. 34:11-56.25 *et seq*. The NJPWA is New Jersey's state law equivalent of the federal Davis-Bacon Act.

71. Under the NJPWA, contractors who are awarded contracts to perform work on jobs funded with public money, must pay the "prevailing wage" set by the New Jersey Commissioner of Labor, for the type of work performed.

72. Dallas submitted its certified payrolls to ICS for the PCC job, as required by the NJPWA, for approximately two weeks. After the initial two weeks of reporting, John O'Rourke, the principal of ICS, contacted Dallas. John O'Rourke advised Relator that it found a discrepancy between the amount of man days Dallas was reporting as having worked and the amount ICS was tracking and submitting for payment in its certified payrolls to the state ("man day issue").

73. Relator raised the man day issue with John Sisto, who, after a discussion with Ted O'Rourke of ICS, instructed Relator to add both himself and his brother Don to the payroll for the PCC job. Relator followed those instructions.

74. John Sisto and Don Sisto were added to Dallas's PCC certified payroll even though neither of them performed work at the PCC job site. The revised, but incorrect, payroll was resubmitted to ICS.

75. After receipt of the revised and incorrect certified payroll that included John and Don Sisto, ICS informed Dallas that an audit of the payroll was being ordered by the New Jersey Department of Labor ("NJDOL") because of Dallas's inaccuracies. John Sisto instructed Relator to request ICS' man days and change Dallas's records to match those of ICS.

76. Initially, at the time of the NJDOL audit request, Don Sisto was not aware of the changes to the payroll records and all changes were being ordered by John Sisto.

77. Relator was again instructed by John Sisto to change Dallas's certified payrolls to include John Sisto, Don Sisto, and Carl Franzetti because of those individuals' higher rates of

- 17 -

pay.  The purpose of adding all of these individuals was to reconcile the inaccuracies between the amount of money requested to be paid from the State of New Jersey and the amount of men being reported on the job site.

78.    The auditor from the NJDOL, Gaetano Riccardi, requested copies of Dallas's payroll records.

79.    At or about the time of the payroll request by Auditor Gaetano Riccardi, John Sisto informed Don Sisto of the previous incorrect submissions to ICS.  Upon learning of these incorrect submissions, Don Sisto instructed Relator to immediately correct the payroll records by issuing retroactive payroll checks to employees who actually performed the work at PCC.  The purpose of these retroactive checks was to submit correct payrolls to Auditor Gaetano Riccardi in response to the audit.

80.    Relator issued and processed the retroactive checks through Dallas's payroll as instructed by Don Sisto.

81.    The retroactive checks were never given to the employees and most were eventually voided by Dallas's accountant, Thomas O'Reilly, who is a partner in the accounting firm Cornerstone Accounting Group, LLP ("Cornerstone").

82.    The only retroactive check that was not voided by Dallas's accountant Thomas O'Reilly was a payroll check issued to Dallas employee Carl Franzetti.  Carl Franzetti's check was given to him in lieu of his yearly bonus.

83.    Dallas was issued a fine in the amount of approximately $34,000.00 by the NJDOL in June 2011.

84.     The fraudulent practice of falsely certifying payroll records from the PCC job along with Dallas's efforts to cover up its fraud is evidence of a pattern and practice of defrauding a government entity.

85.     Dallas's pattern and practice of defrauding a government entity was repeated in virtually the same way on the Boiler House project at Picatinny Arsenal.

### C.     Defendant's "Piggy Bank" and Dependable Iron

86.     To carry out and fund its fraudulent schemes, Dallas entered into a fraudulent arrangement by which it would supply scrap metal obtained from its demolition and crushing jobs to Dependable Iron.

87.     Dependable Iron's principal, John Rotella, is a longtime childhood friend of John Sisto and Don Sisto.

88.     The arrangement between Dallas and Dependable Iron involved the delivery of scrap metal from jobs on which Dallas was subcontracted.  When Dallas's trucks would deliver the scrap metal to Dependable Iron, they would return empty, but no payment was received in exchange.  Rather, the only "documentation" that Dependable would provide to the Dallas scrap delivery driver is a ticket containing:  (1) the weight of the truck loaded with scrap upon its arrival at Dependable Iron; (2) the weight of the truck after the scrap metal was unloaded; and (3) the difference between (1) and (2), which would represent the total weight of scrap delivered.

89.     Throughout any given year Dallas delivered multiple tons of scrap metal to Dependable Iron, and in exchange, Dependable Iron would make nominal check "payments" to Dallas for approximately $20,000.00.

90.     The fair market value of the multiple tons of scrap metal that Dallas delivered far exceeded the $20,000.00 per year that Dependable Iron paid and that Dallas actually recorded on its books.

91.     The scrap metal deliveries described above allowed Dallas to build up a credit "reserve" with Dependable Iron that could and would be turned into cash upon request, usually made by one of the Sisto brothers, that would be used for business purposes as well as and for personal expenses. In other words, Dallas and the Sistos treated Dependable Iron as a "piggy bank" reserve.

92.     Cash obtained for personal purposes was, and is, used to purchase expensive luxury automobiles and electronics for John and Don Sisto and their families.

93.     Cash obtained for personal purposes would be received from Dependable Iron and paid to John Sisto, who converted the cash received into money orders for household expenses and other personal items described in the preceding paragraph.

94.     Cash obtained for business purposes was, and is, used to pay overtime hours to Dallas employees and also to make up part of the difference between the prevailing wage and Davis-Bacon rates of pay and the actual pay checks that Dallas employees received from working on publically-funded jobs ("public job shortfall"). These extra cash payments included payments to workers who had knowledge that their pay checks were well below the prevailing wage or Davis-Bacon rate of pay. These extra cash payments were made in order to keep these employees from complaining about underpayment to government officials.

95.     John Sisto required Relator, as part of her job duties, to keep track of the hours worked on each job site by each worker each day including overtime hours on a weekly basis. Relator was further instructed to record these hours on a handwritten piece of paper daily. Each

handwritten piece of paper contained the name of the job, the hours of regular time worked by each worker, and the hours of overtime worked for each worker. On a weekly basis, the handwritten piece of paper was handed to John Sisto upon his request. John Sisto would decide at that moment how much money should be paid to each worker for overtime and the public job shortfall. John Sisto would then instruct Relator to obtain the amount of money from Dependable Iron and place the handwritten piece of paper in a paper shredder nearby. This procedure would be carried out for every job performed by Dallas.

96.     After Relator was instructed to obtain the amount of money from Dependable Iron, she would contact Dependable Iron by either phone, facsimile, email or text message with the amounts of money required.

97.     John and Don Sisto would personally travel to Dependable to obtain the cash, which would then be placed into individual envelopes, each of which was labeled with the worker's name and contained the amount of money owed to the particular worker. John and Don would personally hand each laborer their cash-filled envelope, which Relator would personally hand the scrap metal drivers their cash-filled envelope.

98.     For every cash payment received from Dependable Iron, Relator was instructed by Don Sisto to write a check payable to "Dallas Contracting Petty Cash" with a memo indicating the name of one of the companies that Dallas used to provide refuse services.

99.     The purpose of the petty cash checks described in the preceding paragraph was to hide the inflow of cash from Dependable Iron and avoid reporting it as income. To achieve this purpose, the memo line would name companies that Dallas used for refuse services. Some of the company names used were "Canadian Pacific," "TLA Newark", "MCUA", and "Oak Island." These payments would be referenced accordingly on the books and records as "garbage" or

"refuse services." In this way, the money received from Dependable Iron was booked as an expense for garbage disposal rather than reportable income to the company.

100.   Upon information and belief, Dallas continues to the present day its practice of cash payments for overtime to workers.

101.   Upon information and belief, John and Don Sisto's practices of cash payments for the practice of payment of cash for payment of public job shortfall and for John and Don Sisto's personal expenses continues to the present day.

102.   At all relevant times, Dallas's accountant is and has been Thomas O'Reilly from the accounting firm Cornerstone Accounting Group, LLP ("Cornerstone") located at 101 Eisenhower Parkway, Roseland, New Jersey, 07068.

103.   Thomas O'Reilly performed yearly audits of the company's finances and prepares the company's yearly income tax returns.

104.   Thomas O'Reilly instructed Relator to give him information regarding certain Dallas accounts including scrap, disposal, and fixed assets.

105.   Relator provided Thomas O'Reilly with all information regarding Dallas's scrap, disposal, and fixed asset accounts.

106.   At all relevant times, Thomas O'Reilly had knowledge of the fraudulent practices and transactions engaged in by Dallas.

107.   At all relevant times, Thomas O'Reilly assisted Dallas in evading payment of income taxes by changing the books and records to reflect less income than Dallas actually earned on scrap sent to Dependable. Thomas O'Reilly's assistance included making books and records calculations that facilitated Dallas to report the scrap sent to Dependable as Dallas's payment for refuse services.

**COUNT I**
**Federal False Claims Act Violations for Causing Submission of**
**False Claims to the United States, 31 U.S.C. § 3729(a)(1)(A)**

108.     Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

109.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

110.     By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States or its Government contractor for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).[1]

111.     Each claim Defendant submitted for payment by the United States, or caused to be submitted through a Government contractor for payment by the United States, in the operation of its demolition and scrapping services was false as a result of Defendant's illegal schemes as described herein.

112.     Each claim for payment for such services so submitted represents a false or fraudulent claim for payment which would not be paid but for Defendant's fraudulent conduct as described herein.

113.     By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

---

[1] The False Claims Act was amended by Congress as part of the Fraud Enforcement and Recovery Act of 2009, Pub.L. 111-21 (May 20, 2009) (the "FERA amendments"), and again as part of the Patient Protection and Affordable Care Act, Pub.L. 111-148 (March 23, 2010).  The FERA amendments modified and renumbered the subsections of § 3729(a).  The amendments made to section 3729(a)(1) (now numbered 3729(a)(1)(A)) are not retroactive, and therefore the 1986 version of the False Claims Act applies to Defendant's conduct prior to May 20, 2009.

## COUNT II
### Federal False Claims Act Violations for False Records and Statements Made to Get False Claims Submitted to The United States Paid, 31 U.S.C. § 3729(a)(1)(B)

114.     Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

115.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

116.     By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records and statements material to false or fraudulent claims paid or approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).[2]

117.     Each record or statement Defendant made or used in providing demolition and scrapping services to the United States or a Government contractor was false as described herein and represents a false or fraudulent record or statement.

118.     Each claim for payment for such demolition and scrapping services so submitted resulting from such false or fraudulent record or statement as described herein represents a false or fraudulent claim for payment which would not be paid but for Defendant's false or fraudulent records or statements.

119.     By reason of Defendant's misconduct, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

---

[2] The FERA amendments to subsection 3729(a)(2) (now numbered 3729(a)(1)(B)) are expressly made applicable to claims pending as of June 7, 2008. *See* Pub. L. 111-21, Sec. 4(f)(1) (stating this change should be deemed to "take effect as if enacted on June 7, 2008" and should "apply to all claims under the False Claims Act (31 U.S.C. 3729 *et seq.*) that are pending on or after that date").

## PRAYER FOR RELIEF

**WHEREFORE**, Relator Patricia Mirando requests that judgment be entered against the Defendant, ordering that:

A.     Defendant ceases and desists from violating the False Claims Act, 31 U.S.C. §§ 3729-33;

B.     Defendant pays not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461; Public Law 104-410), plus three times the amount of damages the United States has sustained because of its actions;

C.     Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

D.     Relator be awarded reimbursement for all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d);

E.     Defendant be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

F.     Defendant disgorges all sums by which it has been enriched unjustly by its wrongful conduct; and

G.     The United States and Relator Patricia Mirando recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Patricia Mirando hereby requests a trial by jury.

DATED:   October 15, 2012

Respectfully submitted,

**KROLL HEINEMAN CARTON LLC**
Attorneys for Plaintiff-Relator Patricia Mirando

By: _____

Albert G. Kroll, Esq.
John P.J. Mattiace, Esq.
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey  08830
Tel:   732.491.2100
Fax:   732.491.2120
akroll@krollfirm.com
jmattiace@krollfirm.com

**MILBERG LLP**

Anita B. Kartalopoulos, Esq.
Rolando G. Marquez, Esq.
One Pennsylvania Plaza
New York, New York  10119-0165
Tel:   212.594.5300
Fax:   212.868.1229
akartalopoulos@milberg.com
rmarquez@milberg.com

- 26 -

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiff-Relator hereby certifies that the matter in controversy is the not the subject of any matter pending in any Court or of any pending arbitration or administrative proceeding.


## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1(d)

Plaintiff-Relator hereby certifies that the relief sought includes non-monetary relief and therefore this case should not be designated for compulsory arbitration under Local Civil Rule 201.1(d). Furthermore, this claim is a *qui tam* claim brought on behalf of the United States Government which presents policy concerns precluding compulsory arbitration and that make adjudication, rather than arbitration, appropriate.


DATED:   October 15, 2012

**KROLL HEINEMAN CARTON LLC**
Attorneys for Plaintiff-Relator Patricia Mirando


By: _____

Albert G. Kroll, Esq.
John P.J. Mattiace, Esq.
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey  08830
Tel:   732.491.2100
Fax:   732.491.2120
akroll@krollfirm.com
jmattiace@krollfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Complaint filed under seal, pursuant to 31

U.S.C. § 3730 was served on the following:

> The Honorable Eric H. Holder, Jr.
> Attorney General of the United States
> United States Department of Justice
> National Place Building
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001
>
> Paul J. Fishman
> United States Attorney
> District of New Jersey
> United States Attorney's Office
> Peter W. Rodino, Jr. Federal Building
> 970 Broad Street, 7th Floor
> Newark, NJ 07102

DATED:   October 15, 2012

John P.J. Mattiace, Esq.
**KROLL HEINEMAN CARTON LLC**
Metro Corporate Campus I
99 Wood Avenue South, Suite 307
Iselin, New Jersey  08830
jmattiace@krollfirm.com

**One of the Attorneys for Plaintiff-Relator
Patricia Mirando**